## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

OCT 0 1 2015

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| **Sealed,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 14-1688 |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| **Sealed** | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Defendant. | ) | **DO NOT ENTER ON PACER** |
| | ) | |
| | ) | **DEMAND FOR JURY** |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>and STATE OF TEXAS *ex rel.*<br>MICHAEL REHFELDT and<br>LANDRIS JOHNSON, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No: 14-1688 |
| v. | ) ) | **FILED UNDER SEAL** |
| HEART TO HEART OF TEXAS, LLC,<br>d/b/a HEART TO HEART HOSPICE | ) ) ) | **DO NOT PLACE IN PRESS BOX** |
| Defendant. | ) ) ) | **DO NOT ENTER ON PACER** |
| | ) | **DEMAND FOR JURY** |

### FIRST AMENDED *QUI TAM* COMPLAINT

Relators Michael Rehfeldt and Landris Johnson, on behalf of themselves, the United

States of America, and the State of Texas, allege and claim against Defendant Heart to Heart of

Texas, LLC, doing business as Heart to Heart Hospice ("Heart to Heart"), as follows:

### JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False

Claims Act").    Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.    Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because

Defendant qualifies to do business in the State of Texas, transacts substantial business in the

State of Texas, transacts substantial business in this judicial district, and can be found here.

Additionally, and as described herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and made or used false records material to have such claims paid.

     3.     PARTIES

     4.     Defendant Heart to Heart Hospice ("Heart to Heart") is a Medicare-certified hospice provider offering hospice services throughout eastern and southern Texas including two locations in Houston, Texas. Heart to Heart currently supplies hospice care to approximately 1,500 patients. Through their experience at Heart to Heart, Relators have learned that Defendant conducts its hospice operations with the fraudulent intent to defraud the United States by submitting claims for hospice care with complete disregard for patient eligibility, Medicare billing requirements, or compliance with other federal healthcare laws and regulations.

     5.     Plaintiff-Relator Michael Rehfeldt has extensive experience as a hospice manager and administrator. In August 2011, Mr. Rehfeldt was hired by Heart to Heart as Executive Director of its Dallas office. Mr. Rehfeldt quickly discovered that Heart to Heart makes little to no effort to comply with Medicare conditions of payment or participation and routinely bills for patients who lack required documentation of terminal illness and who are not eligible for hospice care. Mr. Rehfeldt made repeated efforts to bring these problems to the attention of Heart to Heart ownership, but was ignored. In fact, Mr. Rehfeldt learned that ownership is well aware of Heart to Heart's blatant compliance deficiencies but continues to bill the United States in violation of the False Claims Act, Texas Human Resources Code §§ 36.001-36.117 (the Texas Medicaid Fraud Prevention Act), and numerous other federal and state healthcare laws.

6.     Plaintiff-Relator Landris Johnson has nine years experience in hospice care as a former executive director and area director of marketing.  In May 2011, Mr. Johnson was hired by Heart to Heart as Regional Director of Business Development in the Dallas-Fort Worth area. Mr. Johnson quickly discovered that Heart to Heart makes little to no effort to comply with Medicare conditions of payment or participation and routinely bills for patients who lack required documentation of terminal illness and who are not eligible for hospice care.   Mr. Johnson also witnessed Bill Thurman, President and CEO of Heart to Heart, give employees and non-employees $100 cash in exchange for referrals during the summer of 2011 manipulate the average length of stay of its patients in order to mask its long length of stay patients and surreptitiously avoid repaying Medicare moneys it knew or should have known it would otherwise owe to the United States under the hospice aggregate cap. Since filing the initial complaint in this matter, Mr. Johnson has assisted the Criminal Division of the Department of Justice in its investigation of Heart to Heart by, *inter alia*, wearing a recording device and providing the Department with documentation and information related to the company's payment of kickbacks.

7.     Prior to filing this Amended Complaint, Relators voluntarily disclosed to the United States the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relators are the original source of the information for purposes of that Section.   Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## THE MEDICARE HOSPICE BENEFIT

**I.      Background**

8.      Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

9.      Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."  42 C.F.R. § 418.3.  In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment. *See* 42 U.S.C. § 1395d.A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage.42 C.F.R. § 418.28.

10.      Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.  The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 <u>On Death and Dying</u> is acknowledged to have altered modern perceptions about care for the terminally ill.  In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients.  Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."  In 1982, Congress

created a provisional Medicare Hospice Benefit, made permanent in 1986 ("Hospice").  By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

11.     From such humble, altruistic roots, Hospice has become big business.  Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006, and are estimated to be well over $14 billion at the time of the filing of this complaint, according to a 2011 report by Bloomberg, "Aunt Midge Not Dying in Hospice Reveals $14 Billion Market." In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Since then, the situation has only gotten much worse: in late 2013, *The Washington Post* issued an investigative report entitled, "Hospice Firms Draining Billions from Medicare," revealing that "over the past decade, the number of 'hospice survivors' in the United States has risen dramatically, in part because hospice companies earn more by recruiting patients who aren't actually dying." *The Washington Post* article drew its conclusions from data collected by hospices in California, but venture capitalists and other investors all across the country have been quick to perceive that Hospice represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying. In Texas and specifically at Heart to Heart, relators experienced through their personal first-hand knowledge and observations that Defendant is among the corporations who are fraudulently using hospice as a profit center by presenting false claims for per-diem reimbursements for patients that they knew or should have known did not qualify for the Medicare Hospice Benefit.

12.     Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home."  Nevertheless, Heart to Heart and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II. The Federal Anti-Kickback Statute

13.     The Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupts the medical decision-making process and could result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form. The AKS was enacted in 1972 to "provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

14.     In 1977, Congress amended the AKS to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b. In doing so, Congress noted

that the purpose of the anti-kickback statute was to combat fraud and abuse in medical settings, which:

> [C]heats taxpayers who must ultimately bear the financial burden of misuse of funds . . . diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs.

> H.R. Rep. No. 95-393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047.

15.     In 1987, Congress again strengthened the AKS to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

16.     The AKS prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

17.     "Kickbacks" have been defined as including payments, gratuities, and other benefits paid to physicians.

18.     In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in federal health care programs, 42 U.S.C. § 1320a-7(b)(7), as well as civil monetary penalties of $50,000 per violation, 42 U.S.C. § 1320a-7a(a)(7), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

19.     Compliance with the AKS is a precondition to participation as a health care provider under the federally-funded healthcare programs and the state Medicaid programs. In addition, compliance with the AKS is a condition of payment for claims for which Medicare or Medicaid reimbursement is sought by medical providers.

20.     And, in March 2010, the AKS was amended to explicitly state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act ("PPACA"), Pub.L. No. 111-148, 124 Stat. 119 § 6402(f) (2010) (codified as amended at 42 U.S.C. § 1320a-7b(g)).

21.     Hospice providers must submit form CMS 855-A in order to be allowed to participate in the Medicare program. That form requires the provider to sign a certification that states in relevant part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

### III. Hospice Benefits, Reimbursements, and Requirements

22.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22. Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient

respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

23.     Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302.Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.   Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

24.     In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services. *See* 42 C.F.R. § 418.202.  The hospice must design a plan of care (POC) inclusive of all covered services necessary to meet the patient's needs.  *See* 42 C.F.R. § 418.56.  That POC must be in place prior to the hospice submitting a Medicare bill.

25.     Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the "Aggregate Cap").  The Aggregate Cap is set by CMS according to federal regulations, and in 2012 stood at $25,377.01 per patient.  The Aggregate Cap is not related to expenditures on individual patients.  Rather, it limits the aggregate reimbursement a provider may receive from Medicare.  A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year.   Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $25,377.01.

26.     Medicare will not pay for hospice services provided to patients who are not terminally ill.  *See* 42 U.S.C. §1395y. Furthermore, it is a universal requirement of the Medicare

program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C.

§1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.  Medicare providers may not bill

the United States for medically unnecessary services or procedures performed solely for the

profit of the provider. *Id.*

  27. Federal law authorizes Medicare administrative contractors ("MACs") and fiscal

intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for

particular items or services.  *See* 42 U.S.C. 1395ff.  Accordingly, Medicare Hospice MACs and

FIs publish local coverage determinations ("LCDs") establishing requirements for and

limitations on Hospice coverage.  *See, e.g.,* LCDs Published by Palmetto GBA, Texas Home

Health/Hospice FI. Medicare will not pay for hospice care provided to a patient who does not

meet LCDs. *See* 42 U.S.C. § 1395y.

  28. To enroll as a Medicare provider, Heart to Heart was required to submit a

Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.  In

submitting Form 855A, Heart to Heart made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program
> instructions that apply to this provider. The Medicare laws,
> regulations, and program instructions are available through the
> Medicare contractor. I understand that payment of a claim by
> Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations, and
> program instructions (including, but not limited to, the Federal Anti-
> Kickback statute and the Stark law), and on the provider's
> compliance with all applicable conditions of participation in
> Medicare.

Form CMS-855A.

  29. Heart to Heart then billed Medicare by submitting a claim form (CMS Form

1450) to the FI responsible for administering Medicare hospice claims on behalf of the United

States. *See* CMS Form 1450.  Each time it submitted a claim to the United States through the FI,

Heart to Heart certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

30.     Texas Medicaid requirements for hospice providers are substantially similar to the Medicare requirements described herein.  By signing the Texas Health and Human Services Commission (HHSC) Medicaid Provider Agreement, Providers certify that they will verify claims submitted for payment are true and correct, are actually rendered and are medically necessary. Texas Medicaid Provider Enrollment Application, HHSC Medicaid Provider Agreement,     1.3.1,     1.3.3,     1.3.6,     1.3.7     (Jan.     22,     2014),     available     at http://www.tmhp.com/provider_forms/provider%20enrollment/texas%20medicaid%20provider %20enrollment%20application.pdf.     Providers further certify that they will refund all overpayments, duplicate payments, and/or erroneous payments as quickly as possible. *Id*.  All individuals with knowledge of suspected fraud are required to report the information to the HHSC Office of Inspector General. *Id.* By enrolling as a Medicaid Provider, Heart to Heart certified that its claims were accurate and true, were actually rendered and were medically necessary.

31.     Heart to Heart thus certified that each claim for a hospice *per diem* payment represented a day of care provided to a terminally ill patient, and CMS and the State of Texas expressly conditioned its payment on the truth and accuracy of that certification.  Heart to Heart further certified that its programs were in compliance with Medicare regulations, including the requirement that it provide short-term in patient care related to its patients' terminal conditions.

## DEFENDANT'S FRAUDULENT SCHEMES

32.     From at least 2011 to the present, the Defendant has defrauded the United States through the submission, or causing the submission of false or fraudulent claims to Medicare for

ineligible hospice patients, by their failure to report past overpayments for ineligible patients and to reimburse Medicare for these overpayments, and by providing kickbacks to physicians in exchange for the referral of Medicare patients.

33.     As a result of the Defendant's submission of, or causing the submission of claims that were knowingly false, or with reckless disregard or deliberate ignorance of their falsity, and/or their "knowing" concealment or avoidance of their obligation to the Government, the United States was damaged by reimbursing the Defendant for providing hospice care to patients that were not eligible for the hospice benefit and by the omission of reimbursement from the Defendant.

34.     In addition to billing Medicare for patients with knowledge of their ineligibility, the Defendant knew or recklessly disregarded the fact that their business practices would cause the enrollment and provision of hospice services to ineligible patients, and thus the submission of false claims for the provision of hospice services to ineligible patients.

35.     For example, the Defendant created incentives for staff to admit ineligible patients by providing lucrative monetary bonuses for meeting admission targets set by the Defendant, which it knew or should have known could not be met unless Heart to Heart admitted patients whose terminal diagnosis could not bear scrutiny.

36.     Defendant acted with intentional disregard, reckless disregard, or deliberate ignorance to the statements of staff and outside consultants as well as their own records regarding the presence within Heart to Heart's hospice census of ineligible patients.

37.     These practices, independently and in conjunction with one another, resulted in the "knowing" admission and retention of patients who were ineligible for Medicare benefits and

the submission of false claims to Medicare with respect to patients that were ineligible for the hospice benefit.

38.     As a result, Medicare paid the Defendant monies that should not have been paid and the Defendant retained payments that should have been reimbursed to Medicare.

**I.     Billing for Ineligible Hospice Patients**

39.     The Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

40.     Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.  Defendant perpetrates its scheme by paying inappropriate referral bonuses to staff, by systematically forging physician orders and nursing notes, and by deliberately billing the United States without required documentation of terminal illness.  Heart to Heart has conducted internal audits that noted all of the above deficiencies, but has made no attempt to rectify them or to refund any overpayments to the United States and instead continues to bill the United States with full knowledge that its claims are false.

41.     Defendant is aware, or should have been aware, of the admission of ineligible patients. Around 2007, Defendant's census skyrocketed from approximately 40 patients to nearly 300 patients.  Furthermore, a 2009 Texas state survey identified a total lack of billing controls and substandard care in the Dallas Heart to Heart office.  Subsequently, Dallas lost its program license, which it regained in February of 2012.

42.     In 2011, Zaundra Ellis, the Executive Director of Heart to Heart's Fort Worth office, reported to Relator Rehfeldt that the Tyler, Texas Heart to Heart program bought a nursing home at least a full wing of flat screen televisions in exchange for referrals.  She reported that there were no financial standards in place and money was freely spent on referral sources.

43.     On May 15, 2013, a social worker called in two unskilled referrals from Garnet Hill to Lisa Moore, a Heart to Heart Hospice Consultant.  The social worker requested a manicure and pedicure in return for the referrals.  Moore then contacted Bill [LNU] (believed by Relator Rehfeldt to be Bill Thurman) for the approximately $100.00 for the manicure and pedicure for the social worker.  Subsequently, both patients were admitted.

44.     Furthermore, in the summer of 2011, Bill Thurman paid employees and non-employees $100 cash in exchange for referrals in order to avoid Medicare Cap liability in the Dallas and Fort Worth offices.

### (a)     Defendant Incentivizes the Admission of Ineligible Patients

45.     Heart to Heart Hospice sets aggressive targets for the number of patients for whom it could bill Medicare or other insurance that it wanted each of its consultants to achieve and pressured its employees to meet those targets by offering lucrative bonuses based on admissions.

46.     For example, in 2011 Heart to Heart Hospice Consultants (formerly called "marketers") received a bonus per admission over four patients per month for first-time Medicare admissions or re-admissions greater than 45 days.   Non-funded patients are not credited toward the bonus calculations.  If a consultant had 5 to 8 admission per month, he or she would receive $100 each.   If a consultant had 9-12 admissions per month, he or she would receive $200 each.  This continued in brackets up to 20+ admissions per month, which qualified for a bonus of $500 each.  If the consultant broke the company record of 29 admits in a month, the consultant would receive an additional $2,500.

47.     Additionally, Hospice Consultants were eligible for a quarterly bonus.   If a consultant had 30 admissions during the quarter, he or she would receive $1,000.  If a consultant

had 40 admissions during the quarter, he or she would receive $1,500.  Lastly, if a consultant had 50 admissions during the quarter, he or she would receive $2,000.

48.     Heart to Heart Hospice Consultants were also eligible for annual bonuses.  If a consultant had 120 admissions for the calendar year of 2010, he or she would receive $1,000. For 160 admissions, the consultant would receive $2,500 and for 200 admissions, the consultant would receive $5,000.

**(b)     Defendant Systematically Forges Physician Orders and Nursing Notes**

49.     Defendant's marketers self-generate referrals and instruct nursing home staff to write a doctor's order without the doctor's knowledge.  An Executive Director, such as Sherman Executive Director Cindy Syfert, would then cover for the referral, forging the physician's signature where possible, and the referral would eventually be aimed to the hospice medical director as "family choice."

50.     Consequently, while the hospice medical director believed that the attending physician made the referral, the attending physician never even knew of the referral.

51.     The following patients are examples of the Defendant knowingly forging physician orders or nursing notes:

52.     S.G. was admitted to Heart to Heart with a diagnosis of COPD on May 20, 2013. Billy Teague, a Heart to Heart hospice consultant, approached S.G. and her family at her home prior to obtaining a referral from a physician.  According to Teague, Stephanie Shannon, Dr. Kable's office manager, gave him a verbal order to admit S.G. to hospice.  Teague offered the family an aide four hours per day, five days a week, a service not offered by Heart to Heart.  As a result of this representation, the family discharged their current home health agency and signed up for Heart to Heart hospice.  Upon review, Stephanie Stevens, another Heart to Heart

employee, discovered that there was a referral on file; however, Dr. Kable's signature had been forged. Stevens approached Dr. Kable who confirmed that the signature on the referral was a forgery. Dr. Kable then signed the referral order to evaluate S.G. next to the forgery.

53.     D.S. was admitted with a diagnosis of congestive heart failure on May 10, 2013. Andreen Grigerek-Jackson, a Heart to Heart hospice registered nurse, admitted the patient stating that Dr. Ted Truly, D.S.'s attending physician, had given the verbal order referring the patient to hospice. Dr. Truly later expressed anger claiming that he did not refer D.S. to hospice and was not aware that the patient was on hospice, though he ultimately relented and signed general inpatient (GIP) orders anyway. On May 28, 2013, D.S. was revoked and sent to a skilled nursing unit per Dr. Truly's instructions. At that time D.S.'s ejection fraction was 60 to 65%, which does not meet hospice criteria for congestive heart failure.

54.     On May 29, 2013, Narissa Bausell, a Heart to Heart employee, arrived to admit L.I. Upon review of the patient's chart, she learned that the referral order to evaluate and treat as needed was written by a licensed vocational nurse named Brandy [LNU], but was not signed by a physician. Brandy informed Bausell that Dr. Truly had not given her a verbal order, but that Rusty Summit, a Heart to Heart hospice consultant, told her to write the referral order. Bausell contacted Dr. Truly for an order to admit L.I. Dr. Truly told Bausell that the diagnosis would likely be dementia and to admit L.I. if Heart to Heart determined that the patient met the criteria for admission. Upon examination, Bausell determined that L.I. did not meet the criteria for dementia as of 7:58 pm on May 29, 2013. The next day, Dr. Truly informed Bausell that in his professional opinion, L.I. did not meet the criteria for hospice and that the patient's prognosis was not six months or less.

(c)     **Defendant Bills Without Certification of Terminal Illness or With False Certifications**

55.     Defendant routinely bills the United States for patients who have not been certified as terminally ill by a physician or a nurse practitioner, in violation of 42 C.F.R. § 418.22.

56.     Medicare and the Texas Medicaid Program expressly require that a hospice obtain a physician certification of terminal illness (COTI) – including clinical documentation and a physician narrative supporting the terminal prognosis – prior to submitting a hospice claim. *Id.* ("[T]he hospice must obtain the written certification before it submits a claim for payment."). Defendant, however, has no internal system whatsoever for verifying that patients have been physician-certified before Defendant bills the United States or the State of Texas for their hospice care. Rather, Defendant as a matter of course begins billing at the date of the patient's hospice election, whether or not the patient has been certified as terminally ill. Similarly, Defendant routinely fails to obtain COTIs and nurse practitioner "face to face" visit records upon recertification.

57.     This issue is well-known to Heart to Heart President and Chief Operations Officer Bill Thurman, who has ordered that claims continue to be submitted for these patients despite the critical deficiencies. Relator Rehfeldt met with Thurman in late 2011 and explained to Thurman that Heart to Heart had inappropriate patients on its service and that it needed to discharge those patients. Relator Rehfeldt strongly encouraged Thurman to self-report to OIG, citing his estimate of the total liability of his program alone (the Dallas office) of at least $10 million on direct billing of patients. Thurman told Relator Rehfeldt that he, as an attorney, understood the issues involved, and assured him that "intent" was required for fraud, which was not present. Thurman also promised that if money was owed to the Government, it would be paid back. He

further told Relator Rehfeldt that he would present the information to Kelly Mitchell, owner of Heart to Heart, and the Senior Leadership Team.

58.     Correspondingly, this issue is also well-known to Heart to Heart owner, Kelly Mitchell.   In late 2011, Relator Rehfeldt met with Mitchell in Plano, Texas.   Relator Rehfeldt again reiterated that actionable fraud had and is occurring at the program as evidenced by the program's length of stay profile, non-cancer mix, verbal reports of patients not meeting eligibility, and significant non-compliance with Medicare billing requirements.   Relator Rehfeldt explained that the company and its owners could not simply bury their heads in the sand.   He again reported his estimate of the liability of his program alone being at least $10 million on direct billing of patients.   Relator Rehfeldt told Mitchell that a good deal of fraud was directly attributable to Cindy Syfert, an Executive Director who admitted any referral regardless of eligibility and falsified records.   He further confronted Mitchell with allegations that Mitchell personally protected and awarded Syfert for increasing census.   Mitchell denied doing so. Relator Rehfeldt also explained the benefits of self-reporting to Mitchell.   Mitchell told Rehfeldt that he would repay any monies owed, but that Heart to Heart had chosen to not report the false claims at that time.

59.     The following patients are examples of the Defendant knowingly admitting patients that were ineligible for hospice, which were reported to and ignored by Heart to Heart leadership.

60.     D.B. was first admitted for hospice service by Heart to Heart on October 19, 2010 with a diagnosis of Paralysis Agitans/Parkinson's Disease.   However, there was no evidence in the patient's medical record reflecting this diagnosis.   In fact, patient walked independently, went to flea markets regularly, and had no difficulty swallowing, eating most meals in restaurants.

D.B. was discharged on July 17, 2011. D.B. was re-admitted to hospice service by Heart to Heart on December 7, 2012 as requiring total care, despite the fact that the Nurse Practitioner who conducted the patient's evaluation determined that D.B. was not eligible for hospice. Additionally, on December 6, 2012, patient's attending physician reported that patient was doing much better walking with a cane or walker, had a good appetite, was sleeping well, had no confusion and was fully oriented, and had increased muscle tone in all extremities. Heart to Heart admitted D.B. for Parkinson's with documentation conflicting with the attending physician's evaluation. The patient remained ambulatory and continued to eat most meals in restaurants. D.B. was again discharged as not medically eligible on March 19, 2013. Heart to Heart billed Medicare for all of the days that D.B. was on service, knowing that his objective symptoms belied coverage criteria for the Medicare Hospice Benefit. Despite ultimately acknowledging that D.B. was ineligible for hospice services and discharging him, the company retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

61.     L.W. was admitted to hospice service by Heart to Heart on September 29, 2010 with a diagnosis of Senile Dementia. However, patient presented with mental health issues rather than Senile Dementia, according to Patient Care Manager Shelia Hooper. For example, when staff would go to bathe patient, patient would ask them, "Do you have a dollar? Do you have a coke?" and when staff would answer that they did not patient would respond, "Then you cannot care for me." In August 2013, Heart to Heart was making plans to discharge patient for not meeting medical criteria to remain on hospice. L.W. promptly transferred to another hospice. Heart to Heart billed Medicare for all of the days that L.W. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit. Heart to

Heart retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

62.     D.S. was admitted to hospice service by Heart to Heart on May 9, 2013 with a diagnosis of Cardiac Disease after being discharged from another hospice after her 19th benefit period.  The prior hospice had made significant notes reflecting that patient was not eligible and had demonstrated drug seeking behaviors.  Patient was frequently absent from the home when staff went for visits.  D.S. reported losing her medications shortly after receiving refills.  Staff also noted that D.S. could be heard running through the home to retrieve patient's walker before answering the door.  At other times, patient would answer the door without a walker.  D.S. was discharged on July 18, 2013.  Heart to Heart billed Medicare for all of the days that D.S. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit – and that the patient was likely using hospice merely as a way to obtain painkillers in order to feed an addiction.  Despite ultimately acknowledging that D.S. was ineligible for hospice services and discharging the patient, the company retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

63.     M.T. was admitted to hospice service by Heart to Heart on January 19, 2012 with a diagnosis of Debility, a diagnosis that requires full dependence in "Activities of Daily Living" ("ADLs") and no significant cognitive abilities.  However, the admitting nurse noted that M.T. had a PPS of 60% upon admission, no wounds, was independent with self-care, ate full meals, and had no pain.  Three days later, another nurse noted that M.T. was resting comfortably on the sofa, was pleasant and cooperative to care, and denied pain or discomfort.  The nurse noted that M.T. was a little forgetful and also noted that the family agreed that the patient was not eligible

for hospice.  However, M.T. remained on hospice service for another nine days before being discharged on January 31, 2012 to benefit the program with the Hospice Cap.  Heart to Heart billed Medicare for all of the days that M.T. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit – and even where acknowledgement by members of the staff and patient's family of the patient's ineligibility was noted repeatedly in Heart to Heart's own records.  Despite ultimately acknowledging that M.T. was ineligible for hospice services and discharging the patient (when it became financially beneficial to Heart to Heart to do so), the company retained all of the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

64.    B.M. was admitted to hospice service by Heart to Heart on July 1, 2011 with a diagnosis of ES Cardiac.  Prior to admission, B.M. had been a patient at Methodist Hospital where it was noted that B.M was stable, compensated, and required a transfer to a skilled nursing facility where the patient would receive physical therapy – a rehabilitative service that itself calls into question an end-of-life diagnosis.  Upon admission to Heart to Heart, B.M.'s PPS was 50% and the patient had an oxygen saturation of 98% on room air.  B.M.'s saturations consistently remained from 95-98% through December 2011.  B.M.'s October 13, 2011 Care Plan noted "Patient is minimal assist for ADLs, patient has shown improvement, patient needs a face to face by hospice medical director, feeds self."  The nursing documentation continued to show independence and good intake with a regular diet.  The hospice medical director never went to see B.M. and the patient was discharged on February 22, 2012 as not medically eligible.  Heart to Heart billed Medicare for all of the days that B.M. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit.  Despite ultimately acknowledging that B.M. was ineligible for hospice services and discharging the

patient, the company retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

65.     V.F. was admitted to hospice service by Heart to Heart on May 10, 2010 with a diagnosis of Debility as a transfer from another hospice.  However, the initial nursing assessment noted that the patient was at home and bedbound but was alert and oriented times three, the patient's neurological assessments were within normal limits, and the patient had no history of falls or pain and ate a regular diet.  Again on June 25, 2010, the social worker noted that the patient was alert and oriented times three.  The social worker continued to document V.F.'s condition as "in bed and stable," and V.F.'s daughter reported that the patient was "stable and doing well."  On November 23, 2011, the social worked noted that V.F. had "zero complaints, zero signs of distress or discomfort" and the patient was able to discuss family and church.  Staff consistently documented V.F. at a 6E on the Functional Assessment Scale ("FAST").  V.F. was discharged on April 4, 2012 for not being medically eligible.  Heart to Heart billed Medicare for all of the days that V.F. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit.  Despite ultimately acknowledging that V.F. was ineligible for hospice services and discharging the patient, the company retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

66.     L.L. was admitted to hospice service by Heart to Heart on December 8, 2011 with a diagnosis of COPD. Upon admission, L.L. was in no pain or respiratory distress, had a PPS of 50%, and the patient's skin was in good condition, indicating that there were no advanced issues of COPD medications thinning the skin.  L.L was mostly dependent in ADLs.  Nurses' notes indicate that the patient was very talkative indicating that there was no respiratory distress.

Other nurses' notes indicated that the patient was not in distress and watched TV. L.L. was discharged on March 7, 2012 for not being medically eligible. Heart to Heart billed Medicare for all of the days that L.L. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit. Despite ultimately acknowledging that L.L. was ineligible for hospice services and discharging the patient, the company retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

67.     J.M. was admitted to hospice service by Heart to Heart on October 5, 2011 with a diagnosis of Dementia. J.M. was admitted to a Stonegate Nursing Home for care, where the patient quickly improved with regular medical care. J.M. had good intake and gained weight. Nursing notes indicate that the patient was able to ambulate by December 2011. The March 29, 2012 Eligibility Worksheet noted that J.M. did not seem to be declining since being admitted and had in fact stabilized and gained weight. J.M. had a 50% Karnofsky – indicating a chronic care patient, rather than a terminally ill patient. J.M. was discharged on May 4, 2012 for not being medically eligible. Heart to Heart billed Medicare for all of the days that J.M. was on service, knowing that the patient's objective symptoms belied coverage criteria for the Medicare Hospice Benefit –that the patient was chronic, rather than terminal. Despite ultimately acknowledging that J.M. was ineligible for hospice services and discharging the patient, the company retained the payments it received from Medicare for services it knew were not medically necessary and refused to return such payments.

68.     G.G. was admitted to hospice service by Heart to Heart on February 18, 2012 with a diagnosis of Dementia. Within eleven days of admission, the hospice medical director noted that G.G. had "mild dementia" and "did not qualify any criteria for dementia or COPD or

CVD disease" (double underlined in original notation).  The nurses' notes also indicate that the patient was alert and oriented times three and denied pain.  Despite the hospice medical director's findings and the subsequent nursing notes, G.G. remained on hospice service for three months before being discharged on May 22, 2012 for not being medically eligible.  The blatant disregard of the physician's medical judgment and the objective symptoms noted by nursing staff regarding G.G. is emblematic of Heart to Heart's profit above all approach.  Like all of the patients noted *supra*, Heart to Heart billed Medicare for every day of the three months that it kept G.G. on service despite knowing that its own Medical Director had strongly emphasized that G.G. was not eligible for the Medicare hospice benefit.  As in so many other instances, Heart to Heart ultimately dumped G.G. from its services before the patient became a financial liability under the Medicare Hospice Cap; Heart to Heart tacitly recognized that G.G. was never eligible for hospice services when it discharged him as not terminal without any notable change in his condition, yet it retained all of the payments that it received from Medicare for G.G., refusing to refund the payments for care that it knew was not medically necessary and not covered under the Medicare hospice benefit.

### (d)     Defendant Violated the Anti-Kickback Statute by Paying Remuneration to Physicians and Nurses in Exchange for the Referral of Medicare Patients

69.     Since at least 2011, Defendant has paid remuneration to physicians in exchange for Medicare referrals through sham Medical Director, Associate Medical Director, or Consulting Physician contracts. In some instances, Defendant pays the contracted physicians above-market-value rates in exchange for patient referrals; in others, Defendant pays referring physicians an hourly rate for "educating" patients in his or her non-hospice clinical setting.

70.     In Relator Johnson's experience, Defendant remunerates physicians in exchange for referrals in three principal ways: through sham medical director contracts; through sham

associate medical director contracts; and through sham consulting physician contracts. The facility's executive director executes these contracts with the physicians after Defendant's sales reps approach and "feel out" the physicians. Also, in Mr. Johnson's experience, these contracts must be approved by Heart to Heart corporate officers, including Terry Douglas, the VP of Operations.

71.     While these physicians have formal contracts with Heart to Heart, and in some cases fill out timesheets, the arrangements are shams: the company actually pays the physicians in exchange for referrals, the physicians' compensation contingent upon referrals rather than upon other work, and Heart to Heart terminates the contract if the physician fails to generate enough referrals for Heart to Heart.

72.     Defendant also remunerates physicians and nurses with free continuing education, gift cards, and expensive dinners, which are offered to induce referrals or to reward past referrals.

**(A) Physician Contracts**

**(1) Medical Director Contracts**

73.     Under these arrangements, Defendant pays physicians for medical director services, when in fact the physicians provide no medical director services. They do not, for example, attend IDG meetings or oversee other physicians; instead, Defendant pays these physicians in order to induce them to refer patients, and/or in exchange for past referrals.

74.     The medical director of the Ft. Worth site, Dr. D.C., for example, is paid $5,500 per month, although he does not attend IDG meetings and does not see patients. Instead, this physician was sought out and is paid under a medical director contract because he works at a

referring hospital, and has the ability to — and does — refer or encourage others to refer to Defendant.

### (2) Associate Medical Director Contracts

75.     Defendant also pays physicians under associate medical director contracts. Associate medical directors, in Relator Johnson's experience, do actually perform hospice-related services for Defendant, including attending IDG meetings. They are also expected to refer patients, especially where they had contracts with and sometimes worked in skilled nursing facilities, and Defendant pays them above fair-market value in exchange for these referrals. Where associate medical directors do not refer enough patients, but are otherwise performing as required under the agreement, Defendant releases them from their contracts.

76.     Examples of associate medical directors paid above fair-market value in exchange for referring patients are Dr. G.T. in Bonham, Texas (paid $7,000 per month); Dr. K.H. in Ft. Worth, Texas (paid $16,000 per month in consideration of her large referral base); Dr. M.O. in Dallas, Texas; and Dr. A.K. in Dallas, Texas. Both Dr. M.O. and Dr. A.K were released from their contracts with Heart to Heart because they were not referring enough patients, although they were performing their other duties as required by their contracts. Dr. M.O. was, however, brought back as a consulting physician once he joined Charlton Methodist Hospital, a larger referral source for Heart to Heart.

### (3) Consulting Physician Contracts

77.     Through "consulting physician" contracts, Defendant paid physicians by the hour for the time the physicians spent *with their own patients, in their non-hospice clinical setting as the patients' attending physician*. These consulting physicians are also paid hourly for filling out referral paperwork as the patient's attending physician. These contracts described the payments

as payments made in exchange for "patient education," but in fact they are direct remuneration for referring patients to Heart to Heart. The company referred to these arrangements as contracts "for growth," and paid physicians different hourly rates based on the size of their potential referral base.

78.    In one instance, for example, Defendant paid Dr. M.O. an hourly fee for one hour of "educating" a potential referral in his office, and another hour for filling out referral paperwork. Defendant was, upon information and belief, therefore paying Dr. M.O. for acting as the attending physician of the patients he referred to the hospice, a service for which Medicare was already paying him under the Part A physician reimbursement fee schedule.

79.    In Mr. Johnson's experience, some Heart to Heart facilities, like the Dallas location, pay "consulting physicians" only once the referred patients are admitted; others, like Ft. Worth, pay in exchange for referrals.

80.    As a result of these kickback schemes, Heart to Heart's census has grown exponentially. In 2011, for instance, the Ft. Worth facility had 51 patients; in September of 2015, it has 207. Ft. Worth currently has 5 consulting physicians, and 3 associate medical directors who oversee patient care at IDG meetings. The facility's medical director, Dr. D.C., continues to serve only as a figurehead, and maintains no relationship with and exercises no oversight over the other physicians.

**(B) Kickbacks to Other Healthcare Providers**

81.    Defendant also provided doctors with free continuing medical education, and nurses with free continuing education units. Defendant also provided gift cards and nice dinners to referring nurses, doctors, and hospital liaisons. Defendant only offered these to high-referring doctors, nurses or hospital liaisons, or to doctors, nurses, or hospital liaisons who could

potentially refer a large number of patients to Heart to Heart. At its continuing education events, Heart to Heart gave away higher-value gifts, including Michael Kors purses; Hartmann wallets; iPad Minis, and Fitbits.

82.     These free events, gifts, and gift cards were a pretext for the payment of kickbacks in exchange for past or future referrals.

83.     By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States and the State of Texas, undermined the noble intention and mission of Hospice, defrauded the United States of America and the State of Texas, and jeopardized the already strained Medicare program.

<u>**COUNT ONE**</u>
<u>**PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C.**</u>
<u>**§ 3729**</u>

84.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

85.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a) Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;(b) Defendant submitted false claims for Hospice care provided to patients who were not properly assessed by an RN and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c) Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

(d) Defendant submitted false claims for Hospice services that were provided to individuals who were referred to Hospice as a result of Defendant's illegal provision of kickbacks.

(e) The United States paid the false claims described herein and summarized above.

86.    Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

87.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

88.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

89.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     Defendant created and used false certifications of terminal illness; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)     Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs, and compliance with the Anti-Kickback Statute ;

90.     The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

91.     In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

92.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT THREE
### "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

93.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

94.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:  Defendant knew that it had received millions of dollars in Hospice *per diem* payments for patients who did not qualify for Hospice, and/or who were referred to hospice care in violation of the Anti-Kickback Statute, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

95.     As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

96.     Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

97.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and/or admitted patients who were referred to hospice care in violation of the Anti-Kickback Statute, and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

98.     The United States paid Defendant for such false claims.

99.     Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

100.     Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

101.     Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FIVE
## VIOLATION OF TEXAS MEDICAID FRAUD PREVENTION ACT
## TEXAS HUMAN RESOURCES CODE § 36.001-36.117

102.    Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

103.    By and through the conduct described, *supra*, Defendant knowingly made or caused to be made false statements or misrepresentations of material facts to permit persons to receive benefits or payments under the Medicaid program that are not authorized or that are greater than the benefit or payments that are authorized.  The State of Texas reasonably relied on such false statements or misrepresentations and has been damaged in an amount equal to the payments made by the State of Texas to Defendant under the Medicaid program.

104.    By and through the conduct described, *supra*, Defendant knowingly concealed or failed to disclose information permitting persons to receive benefits or payments under the Medicaid program that are not authorized or that are greater than the benefits or payments that are authorized.  The State of Texas was misled by Defendant's concealment or failure to disclose information and has been damaged in an amount equal to the payments made by the State of Texas to Defendant under the Medicaid program.

105.    By and through the conduct described, *supra*, Defendant knowingly applied for and received benefits or payments on behalf of other persons under the Medicaid program and

converted part of the benefits or payments to uses other than for the benefits of the persons on whose behalf the payments were received. The State of Texas has been damaged in an amount equal to the payments made by the State of Texas under the Medicaid program that were converted by Defendant to uses other than for the benefits of the persons on whose behalf the payments were received.

106. Defendant contracts with the Texas Health and Human Services Commission or other Texas agencies to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program. Defendant knowingly failed to provide to individuals health care benefits or services that they are required to provide under such contracts with the Texas Health and Human Services Commission or other agencies. The State of Texas has been damaged by such failures in an amount equal to the actual cost of such health care benefits or services that Defendants failed to provide.

107. By and through the conduct described *supra*, Defendant knowingly made, used, or caused the making or use of false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the State of Texas under the Medicaid program. The State of Texas reasonably relied on such false statements or misrepresentations and has been damaged in an amount equal to the actual cost of health care benefits or services that Defendant failed to provide and that were instead paid for in part by the State under the Medicaid program.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the State of Texas and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by Texas Human Resources Code § 36.052(a), attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

Date:  October 1, 2015

/s/Caitlyn Silhan
**WATERS & KRAUS, LLP**
Charles S. Siegel
Texas Bar No. 18341875
S.D. Tex. Bar No. 15736
Loren Jacobson
Texas Bar No. 24050813
S.D. Tex. Bar No. 753091
Caitlyn E. Silhan
Texas Bar No. 24072879
S.D. Tex. Bar No. 1465633
3219 McKinney Ave.
Dallas, Texas 75204
Tel. 214-357-6244
csiegel@waterskraus.com
ljacobson@waterskraus.com
csilhan@waterskraus.com


**FROHSIN & BARGER, LLC**
James F. Barger, Jr. *(pro hac vice pending)*
Alabama Bar No. ASB-2336-M76B
Carrie M. Motes *(pro hac vice pending)*
Alabama Bar No. ASB-2968-A83L
Tennessee Bar No. 031680
3430 Independence Drive, Suite 40
Birmingham, Alabama 35205
Tel:    205.933.4006
Fax:    205.933.4008
jim@frohsinbarger.com
carrie@frohsinbarger.com


***ATTORNEYS FOR RELATORS***


**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

**CERTIFICATE OF SERVICE**

On this the October 1, 2015, Plaintiff-Relators hereby certify that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail, Return Receipt Requested, upon:**

Honorable Loretta Lynch
U.S. Attorney General
United States Department of Justice
National Place Building
1331 Pennsylvania Avenue, Room 950 North
Washington, DC 20004

Mr. Kenneth Magidson
United States Attorney
Southern District of Texas
Attn: Andrew Bob, Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, TX 77002

Mr. Ken Paxton
Texas Attorney General
Civil Medicaid Fraud Section
Attn: Mark W. Coffee, Assistant Attorney General
P.O. Box 12548
Austin, TX 78711-2548

*/s/Caitlyn Silhan*
Caitlyn E. Silhan